UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| SPBS, INC., § | | |
|     Plaintiff, § | | |
| § | | |
| v. § | | Civil Action No. 4:18-CV-00391-ALM |
| § | | |
| JOHN D. MOBLEY and § | | |
| INTERMED GROUP SERVICES, INC., § | | |
|     Defendants. § | | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S POST-HEARING BRIEF IN SUPPORT OF ITS APPLICATION FOR PRELIMINARY INJUNCTION**

Defendants John D. Mobley ("Mobley") and InterMed Group Services, Inc. ("InterMed") (collectively, "Defendants") submit this Response in Opposition to Plaintiff SPBS, Inc.'s ("SPBS" or "Plaintiff") Post-Hearing Brief in Support of its Application for Preliminary Injunction.

### I. SPBS CANNOT MEET ITS BURDEN ITS BURDEN TO SUPPORT INJUNCTIVE RELIEF.

After initially filing suit in Oklahoma state court, abruptly dismissing the lawsuit, forum-shopping by refiling weeks later in this Court, regurgitating the same, exact failed arguments attempted in Oklahoma, expending Defendants' time and resources over two days of evidentiary hearings, and now additional supplemental briefing, SPBS did not, and cannot, to demonstrate any evidence to support its Application for Preliminary Injunction as to all four elements necessary to obtain injunctive relief. Ultimately, the single question that should be asked is what is SPBS's motivation: misguided paranoia or spiteful revenge?

### II. MISCHARACTERIZATIONS OF MOBLEY AND INTERMED'S TESTIMONY DISTORT ACTUAL AND UNCHALLENGED EVIDENCE.

SPBS attempts to recast the testimony to fit its own vision by claiming contradictions in Mobley and Staab's testimony, but there are no such contradictions:

*Mobley*

- Mobley made clear on both days of testimony that SPBS has not serviced imaging equipment for many years. SPBS has not had an imaging division during the entirety of Mobley's second employment. SPBS's outsourcing of low end imaging equipment to third party vendors is not the relevant imaging market.

- Mobley's affidavit testimony refers only to the Dallas "office" on Noel road, and not to all the times he visited Texas for work. There is no contradiction.

- Mobley consistently testified that it was always understood he would work from his house in Oklahoma. Mobley also testified that sometime after he began his second employment with SPBS, Daugherty initially considered having Mobley move to Texas after his daughter graduated from high school. However, Mobley also stated that in approximately December 2017, Daugherty rescinded that notion and instead informed Mobley that he may not have a job for much longer if the company did not turn around its financial position.

- Mobley explained that his experience in the medical equipment business as well as his duties as an employee equipped him with the knowledge necessary to have discussions with Blue Pearl Veterinary partners. SPBS offered no standard for qualification that Mobley should have had to call on veterinary practices.

- Mobley testified that while he did not initially recall signing the Agreement, he did remember that on November 13, 2013—the date on which the Agreement was signed—he was in Oklahoma City due to health issues of his wife. Therefore, the Agreement was clearly and indisputably signed in Oklahoma City.

- Mobley testified to his belief that "contracts, pricing lists, customer lists, customer preferences, and marketing materials" do not automatically constitute confidential information or trade secrets because in the industry such information is often freely obtainable from customers and vendors alike. Whether SPBS likes it or not, that is the nature of this industry.

*Staab/InterMed*

- Staab, InterMed's CEO, made clear that to his knowledge InterMed and SPBS are not competitors because they have never come across one another in any competitive bidding process or otherwise to Staab's knowledge. Staab further testified that its customers have expressly told him that SPBS does not do imaging business. Staab also testified that InterMed services only a portion of JLL's Kindred business in Florida, while SPBS services a wholly different region and neither has competed against each other for the same business.

- Staab testified that he would not be opposed to growing his business. He did not say that he is seeking to actively pursue SPBS's customers and prospective customers. InterMed is not prohibited from doing so. He also clearly answered the question as to the identity of some of its competitors.

- Staab did not "refuse" to identify competitors. He made clear that InterMed does not need to compete for business because they provide services that differ greatly from the vast majority of companies in the industry.

- Staab made clear in his testimony that while he does require his employees to sign non-compete and non-disclosure agreements, he does so as a formality as well as a deterrent of immoral behavior rather than because he is concerned with any so-called confidential and trade secret information being divulged. Additionally, the fact that Staab indicated that InterMed's "accounting" and "customer relationship management program" are password protected is immaterial as this information is wholly different from the type of information that SPBS claims to be "confidential" or trade secrets.

However, Daugherty *did* have contradictory testimony. When asked whether he sought to have Mobley fired from InterMed, Daugherty resolutely stated "no." This prompted the Court to clarify whether this meant he no longer wished to enforce the noncompete clause of the Agreement. Daugherty then decided to state that he did in fact want to enforce the noncompete. His attorney's attempt to rehabilitate him only muddied the water even more and makes it unclear what SPBS's true aspirations are.

### III. <u>SPBS HAS NOT DEMONSTRATED THE NEED FOR INJUNCTIVE RELIEF.</u>

1. *SPBS Cannot Demonstrate a Substantial Likelihood of Success on the Merits.*

   a. **SPBS Cannot Demonstrate a Substantial Likelihood of Success on its Claim that Mobley Breached the Agreement. (Mobley Only)**

      i. <u>The Agreement is Unenforceable Because Oklahoma Law Applies.</u>

SPBS goes to great lengths to misrepresent not just the testimony, but also Mobley and InterMed's legal arguments. In reality, the testimony elicited at the hearings strongly supports Mobley and InterMed's position that Oklahoma law governs the Agreement and thereby renders it unenforceable.

### A. **Oklahoma has a More Significant Relationship With the Parties and Transaction at Issue.**

In addition to Mobley and InterMed's prior briefing already before the Court, the testimony elicited at the hearing demonstrates that Oklahoma has a more significant relationship with the parties and the Agreement at issue. While SPBS correctly lists the factors as expounded by the Fifth Circuit in *Cardoni v. Prosperity Bank*,[1] it conveniently distorts the testimony from the hearings in an attempt to tip the scales in its favor:

- **Place of Contracting:** SPBS issued Mobley's offer letter and Agreement by email to his personal email address, which Mobley testified to accessing from his <u>residence in Oklahoma City, Oklahoma</u>. Additionally, Mobley unequivocally testified that due to his wife's health situation, he was in Oklahoma City on November 13, 2013, the date that Mobley signed the Agreement.[2] *Because Oklahoma is where the offer letter and Agreement were executed, this contact strongly favors Oklahoma.*

- **Place of Negotiation of the Contract:** Mobley testified that he conducted all negotiations for the offer letter from Oklahoma. Additionally, as stated above, Mobley was indisputably in Oklahoma due to his wife's health, in signing the Agreement, which was, according to SPBS, sent *simultaneously* with the offer letter. *This contact, coupled with the Agreement being executed in Oklahoma, favors Oklahoma.*

- **Place of Performance:** Mobley repeatedly testified that he was permanently stationed at his home office in Oklahoma City and that he performed the vast majority of his work in Oklahoma City. He also worked for SPBS in his first stint from Oklahoma. Daugherty further testified that it was readily understood Mobley would work from his home in Oklahoma City, and Mobley corroborated this understanding. *This contact strongly favors Oklahoma.*

- **Location of the Subject Matter of the Contract:** SPBS disingenuously spins Mobley's testimony to claim that he "spent considerable time" working in Texas.[3] However, SPBS's own reliance on figures from its supplemental briefing belies its insinuation of how Mobley performed his job. Even assuming SPBS's claim that Mobley traveled to Texas "between 75 and 84 time between November 2013 and March 2018," Mobley's repeated testimony that he spent at least 70% of this time

---

[1] 805 F.3d 573, 582-83 (5th Cir. 2015).

[2] *See Cardoni*, 805 F.3d at 583 (finding, in citing the Restatement, that the place of contracting is where the last act necessary occurred to make the contract binding).

[3] *See* Dkt. 21, p. 9.

working from his home office in Oklahoma City is accurate. Between November 12, 2013 and March 23, 2018, there were approximately 1093 working days. Assuming Mobley traveled to Texas 84 times (which Mobley disputes), with each trip averaging 3 nights, the calculation is a total of 252 working days spent in Texas. That represents only <u>23%</u> of Mobley's time spent in Texas over a five-year period, easily corroborating Mobley's testimony that he spent at least 70% of his time in Oklahoma.[4] *This contact favors Oklahoma.*

- **Domicile, Residence, Nationality, Place of Incorporation, and Place of Business of the Parties:** SPBS is headquartered in Texas, Intermed in Florida, and Mobley resides in Oklahoma. *This contact, at best, is neutral.*

### B. Oklahoma has a Materially Greater Interest than Texas.

The evidence elicited overwhelmingly demonstrates that Oklahoma has a materially greater interest in the enforceability of the Agreement than Texas:

- **The Employee's Residence:** Mobley is a 40-year resident of Oklahoma. During his employment with SPBS between 2009-2011 and 2013 and 2018, Mobley resided *and worked* in Oklahoma. *This factor strongly favors Oklahoma.*

- **Operations in the State:** While it is true the majority of customers are in Texas, Mobley performed over 70% of his work from his home office in Oklahoma.[5] *This factor slightly favors Oklahoma or, alternatively, is neutral.*

- **Interest in Protecting Employees Residing and Working within the State:** Mobley was a resident of Oklahoma and worked the vast majority of his time from his home office in Oklahoma City. Therefore, Oklahoma has a strong interest in protecting the interests and employability of its citizens within the borders of its state.[6] *This factor strongly favors Oklahoma.*

- **Interest in Enforcing Parties' Contractual Expectations:** Mobley testified that it was understood he would work from home in Oklahoma City. In fact, Mobley testified that he was always operating from his home state of Oklahoma during his first stint at SPBS, wherein SPBS did not even require him to sign a noncompetition,

---

[4] *See Cardoni*, 805 F.3d at 583 n.10 (finding that even though computer systems accessed by bankers were in Texas and loans had to be sent to Texas for approval that these "Texas contacts . . . are easily outweighed by the fact that Oklahoma is where the bankers maintained their offices and conducted the vast majority of their business").

[5] *See Cardoni*, 805 F.3d at 583 n.10 (finding that Texas contacts were "easily outweighed by the fact that Oklahoma is where the bankers maintained their offices and conducted the vast majority of their business").

[6] *See Cardoni*, 805 F.3d at 584.

- non-solicitation, or nondisclosure agreement. It is not disputed that SPBS is a Texas company with majority Texas customers. But under Texas law, a choice-of-law provision is not unassailable.[7] *This factor slightly favors Oklahoma, or, alternatively, is neutral*.

- **Interest in Enforcing an Agreement Made by a Company in the State:** SPBS is a Texas company and has an interest in enforcing the Agreement. However, as stated *supra*, Mobley is a long time resident of Oklahoma, worked previously for SPBS without a noncompete restriction, and executed the Agreement in Oklahoma, making Oklahoma the place of contracting. *This factor favors Oklahoma or, at best, is neutral.*

### C. Applying Texas Law to the Agreement Would Contravene Oklahoma's Fundamental Public Policy Against Noncompete Agreements.

Lastly, SPBS does not attempt to refute that Oklahoma has a fundamental public policy that would be contravened by the Texas choice-of-law provision. *See Cardoni*, 805 F.3d at 585-88. Therefore, it is undisputed that this element of the choice-of-law analysis is strongly favors Oklahoma law.

### D. The Agreement is Unenforceable Under Oklahoma Law.

As Defendants have briefed at length Oklahoma's strong statutory prohibition on noncompete agreements, Defendants simply incorporate their briefing in the corresponding section of their Response in Opposition to Plaintiff's Application for Preliminary Injunction herein. *See* Dkt. 13, pp. 13-16. As Oklahoma law renders the noncompete unenforceable, Plaintiff's Application for Preliminary Injunction must fail as a matter of law.

### ii. *Alternatively, Even if the Texas Choice-of-Law Provision is Enforceable, the Agreement as Written is Unenforceable under Texas Law.*

Even if the Court determines that the Agreement is subject to Texas law, as an initial matter, the agreement as written is vague, ambiguous, and unduly broad. Specifically, Section 7 of the Agreement states:

---

[7] *See Cardoni*, 805 F.3d at 580-81.

> "During Employee's employment and for a period of twelve (12) months after Employee ceases to be employed by Employer, Employee shall not **within a 250 mile radius of** [Lubbock, San Angelo, Arlington, Waco, Houston, and/or Dallas, Texas; and/or Albuquerque, New Mexico; and/or Oklahoma City, Oklahoma], **directly or indirectly, either for Employee's own account** or as a partner, shareholder (other than shares regularly traded in a recognized market), officer, **employee**, agent **or otherwise**, **be employed by, connected with, participate in**, consult or otherwise associate with any other **with any other business, enterprise or venture that is the same as, similar to or competitive with Employer**."[8]

Because the Agreement "does not limit the scope of activity prohibited in any manner," it is unreasonable under Texas law; in other words, it creates an industry-wide ban on Mobley. *McKissock, LLC v. Martin*, 267 F. Supp. 3d 841, 855-56 (W.D. Tex. 2016); *see also Wright v. Sport Supply Grp.*, 137 S.W.3d 289, 298 (Tex. App.—Beaumont 2004, no pet.) ("A restrictive covenant is unreasonable unless it bears some relation to the activities of the employee."); *McNeilus Cos. Inc. v. Sams*, 971 S.W.2d 507, 511 (Tex. App.—Dallas 1997, no writ) ("[W]e conclude that the trial court could have reasonably found that prohibiting [the defendant] from working *in any capacity* for a . . . competitor [of the plaintiff] was a restraint too broad in scope."); *PRM, Inc. v. Hartnett*, No. 01-00831-CV, 2002 WL 1435995, at *5 (Tex. App.—Houston [1st Dist.] July 3, 2002, no pet.) ("The covenant [not to compete's] restraint is not limited to the capacity in which [the defendant] worked for [the plaintiff]. Thus, the restraint is overbroad and is unreasonable.").

From even a cursory reading of the Agreement, it is overly broad and unreasonable. Specifically, SPBS asks the Court to restrict Mobley from working in "the territory in which [he] worked while in the employment of [SPBS]."[9] This, SPBS says, is within a "250-mile radius around each of SPBS's offices."[10] Although previously stating that it has no offices in Oklahoma

---

[8] Dkt. 3-15, pp. 6-7 ¶ 7 (emphasis added).

[9] Dkt. 3, p. 16.

[10] Dkt. 3, p. 17.

City,[11] SPBS specifically asks the Court to enjoin Mobley—an Oklahoma City resident—from working within a 250-mile radius of Oklahoma City, Oklahoma (in addition to a 250-mile radius of numerous other cities), *with no limitation as to the scope of activities*. Alternatively, SPBS suggests Mobley can simply work in Florida.[12] The geographical limitation of a 250-mile radius from Mobley's home in Oklahoma City essentially prohibits any work within the state. In addition, there is no reasonable limitation as to activity. Under this overbroad restriction, Mobley could not work in the back office, or even as a janitor, for another company that even remotely is associated with the medical equipment industry.

      iii.      *Notwithstanding, Mobley has NOT Violated the Agreement.*

Should the Court determine the Agreement is enforceable, the simple fact is that Mobley has not violated the Agreement. Mobley testified that he did not take *any* "confidential information or trade secrets"[13] upon leaving SPBS, he did not share *any* such information with InterMed, he did not use *any* such information in his employment with InterMed, and that since April 11, 2018 he has not contacted and/or solicited any of SPBS's customers, nor traveled for business purposes to or within the geographic scope delineated in the Agreement. Additionally, Mobley testified that upon being made aware of the Agreement, he immediately informed InterMed, and, in conjunction with InterMed, took steps to ensure that he would abide by the Agreement in a good faith effort to address SPBS's concerns.

SPBS repeatedly points to two interactions Mobley had prior to April 11, 2018: An attempt to call on Park Place Surgical Hospital in Lafayette, Louisiana ("Park Place") and his

---

[11] Dkt. 3, p. 3.

[12] Dkt. 3, p. 19.

[13] Whether the information SPBS claims is confidential or a trade secret will be discussed as part *infra* relating to SPBS's trade secrets misappropriation claim.

attempt to earn the imaging business of a First Choice E.R. ("First Choice") in the Houston, Texas area. *See* Dkt. 21, pp. 10-11. Mobley does not dispute these interactions occurred. However, with respect to Park Place, Mobley did not talk to anyone other than the receptionist. The business that Mobley was inquiring about at First Choice was *not* SPBS's existing business with First Choice, but rather business that First Choice had with GE relating to imaging services. SPBS was never in the market for, and could not, service First Choice's high end imaging equipment. The discussions with First Choice were of no consequence. No harm came to SPBS as to these contacts, and certainly after SPBS's counsel contacted Mobley, there was absolutely no contact with an SPBS client.

SPBS makes the puzzling assertion in its supplemental briefing that Mobley believes "he should not be bound by the Agreement simply because he 'does not remember' signing it." *See* Dkt. 21, p. 11. Mobley has *never* made such a claim either in any of his filings or in his testimony at the hearings. Mobley has been very clear that these two interactions with Park Place and First Choice occurred prior to being reminded of the Agreement. Once the Agreement was brought to his attention, he ceased any activity that could be construed of running afoul of it, and, in conjunction with InterMed, took affirmative steps to avoid any work that could be construed of violating the Agreement. Therefore, as a matter of law, SPBS has failed to demonstrate a substantial likelihood of success on its breach of contract claim.

### b. SPBS Cannot Demonstrate a Substantial Likelihood of Success on its Misappropriation of Trade Secrets Claims. (Both Defendants)

SPBS avers that an injunction is necessary to enjoin Mobley and InterMed from using its purported trade secrets. However, SPBS has simply not identified any protectable trade secrets or confidential information, has not demonstrated any such information was taken, stolen, or misappropriated by either Mobley or InterMed.

At this point Defendants could engage in an argument over whether the information SPBS repeatedly describes is truly confidential information or trade secrets. Mobley and InterMed have repeatedly refuted most of what SPBS contends is confidential or trade secrets. But in the ultimate determination of whether Mobley and/or InterMed have misappropriated trade secrets, what does it matter? Mobley has testified that he did not take, download, print, email to himself, or otherwise provide to InterMed **any** information, much less trade secrets or confidential information. SPBS's efforts to detail what it considers confidential or trade secrets are simply of no consequence. Mobley did not take any information—except for that which is inside his head.[14] Even Daugherty conceded there was no direct evidence Mobley had taken any confidential information or trade secrets. Further, InterMed never received nor asked for any of SPBS's information. InterMed would not use SPBS's confidential information or trade secrets under any circumstances. A request to enjoin disclosure of information should have substance. SPBS spent two days of examining witnesses, and could not once identify *what* information is alleged to have been misappropriated.

Next, SPBS summarily claims that it need not prove damages have occurred in order to obtain preliminary injunction. "While courts are willing to consider a loss of customers or goodwill as a harm, the movant must come forward with evidence that such an injury is irreparable by showing that the loss cannot be measured in money damages." *ADT, LLC, v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 697 (N.D. Tex. 2015). A party must prove that monetary damages are inadequate by bringing "forward evidence, in the forms of affidavits, declarations, or any other support, that shows imminent harm that is difficult to quantify." *Id.* SPBS did not demonstrate the loss or potential loss of customers, or that monetary damages are

---

[14] *See Cardoni*, 805 F.3d 589-90 (discussing Texas case law in finding that the "inevitable disclosure" doctrine is not part of the law of Texas).

an inadequate remedy. Daugherty's affidavit is bereft of any discussion of harm or irreparably injury that is imminent.[15] Additionally, Daugherty admitted he has no evidence of any loss of customers, no evidence that Mobley took any so-called confidential information or trade secrets, no evidence that Mobley had used any such information, or that InterMed had benefited from any such information. Even the one example that Daugherty raised, the New York Presbyterian Methodist Hospital ("NYPMH") "account", neither Mobley nor InterMed have ever had any contact since Mobley began working at InterMed. In fact, Daugherty cannot even get his story straight. At the hearing, Daugherty testified that SPBS lost the "NYPMH opportunity." Yet, in his affidavit and SPBS's Application for Preliminary Injunction, SPBS "lost a contract." In reality, SPBS has lost nothing from Mobley's departure or his employment at InterMed.

    c. **SPBS Cannot Demonstrate a Substantial Likelihood of Success on its CFAA Claim. (Mobley Only)**

SPBS still cannot prove that any violation under the CFAA has occurred. Mobley testified that SPBS's email account had a storage limit of 15 gigabytes. If the 15 gigabyte limit was exceeded, he could no longer receive new emails. Therefore, it was necessary that he regularly delete emails in order to ensure that continued receiving new emails. Other than personal and spam emails, Mobley testified that because he had to continuously delete emails due to storage limitations, it is likely that he had to delete some emails in the two weeks prior to leaving SPBS. SPBS's characterization of this process—a common cause of consternation amongst employees everywhere—as "destruction" of emails is disingenuous. *See U.S. v. Phillips*, 477 F.3d 215, 219 (5th Cir. 2007) ("Courts have . . . typically analyzed the scope of a user's authorization to access a protected computer on the basis of the expected norms of intended use."). Mobley was fully within his right to delete emails as needed while employed

---

[15] *See* Dkt. 3-1, pp. 1-7.

and the two week period between giving his notice of resignation and leaving SPBS is no different. *See Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 583 (5th Cir. 2015) (finding no violation under the CFAA because defendant "did not exceed authorized access" to his work computer while he was still employed with plaintiff).

Mobley also testified that he did not transfer *any* so-called confidential information or trade secrets to his personal computer prior to leaving SPBS. Mobley further testified that the USB thumb drive created an approximately 18-month old backup of his computer as instructed by SPBS's IT staff. The information on this backup could hardly have been valuable over 18 months later, particularly where the data was merely a copy of the computer data, which continued accumulate more data over time. It is undisputed that Mobley returned the laptop to SPBS, which means that any data that the USB drive had is on the laptop that SPBS has.

SPBS also failed to demonstrate any damages or loss. SPBS cannot state with particularity what emails it alleges that Mobley deleted. *See Bledsoe*, 147 F. Supp. 3d at 660 (finding that a party seeking damages should at the very least "[i]dentify[] the misappropriated data or information . . . to show that a defendant obtained valuable information under the CFAA"). SPBS alludes to, but presented no evidence, purportedly paying someone "to have Mobley's e-mail account analyzed and determine that materials had been deleted." Dkt. 21, p. 15. But SPBS has not provided a forensic report. SPBS conveniently changes the story on what damages and/or losses it has sustained under this claim. In its Application for Preliminary Injunction, SPBS alleged that it "lost revenue from the cancelled contract with New York Presbyterian Hospital" without bothering to explain how this allegation (which the evidence has demonstrated is untrue) is even remotely connected to this claim. Dkt. 3, p. 22. Now, SPBS merely argues that it suffered damages because it purportedly had to pay someone to analyze

Mobley's email account. SPBS's continued waffling on its claims makes injunctive relief improper.

### d. SPBS Cannot Demonstrate a Substantial Likelihood of Success on its Claim that Mobley Breached his Alleged Fiduciary Duty. (Mobley Only)

As has been repeatedly demonstrated in their briefings, testimony, and this supplemental briefing, Defendants have shown that even if a fiduciary relationship exists between Mobley and SPBS, Mobley has done nothing to breach it because Mobley has not breached the Agreement nor has SPBS suffered any damages. Therefore, this claim wholly fails and SPBS is not entitled to injunctive relief.

### e. SPBS Cannot Demonstrate a Substantial Likelihood of Success on its Claim that InterMed Tortiously Interfered with the Agreement. (InterMed Only)

Once again, SPBS distorts testimony in attempt to salvage its untenable claims. In an attempt to attack the credibility of Staab, SPBS mispresents his testimony. However, the testimony clearly shows no tortious interference occurred:

- Staab testified that SPBS made an initial unsolicited offer to purchase InterMed. Staab countered that if he were seriously considering any acquisition, he would prefer to offer to purchase SPBS. Staab repeatedly stated he was not serious in making an offer but rather was rebuffing SPBS's offer to acquire InterMed.

- Whether Mobley's role at InterMed is similar to his role at SPBS is immaterial as the evidence has clearly shown that the two companies are not competitors and work in wholly different markets and offer different services.

- InterMed's hiring of Kevin Ferm ("Ferm") is immaterial and irrelevant to the allegations of this lawsuit. Ferm was hired months after *SPBS* terminated his employment.

- Staab testified that he would not be opposed to growing his business. He did not say that he is seeking to actively pursue SPBS's customers and prospective customers.

Additionally, Staab testified that once aware of Mobley's Agreement, he took immediate steps with his HR department to ensure that Mobley no longer partook in any activities that could

be construed in violation of the Agreement. Staab further testified that he has not sought, accepted, or otherwise obtained or used *any* of the information that SPBS has deemed to be confidential or trade secrets in this lawsuit. Therefore, SPBS cannot demonstrate any substantial likelihood of success on the merits of its tortious interference claim against InterMed.

   2. *SPBS Did Not Meet its Burden to Establish the Likelihood of Irreparable Harm.*

The Supreme Court has explicitly stated that "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat'l Resources Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Rather, the standard requires "that irreparable injury is *likely* in the absence of an injunction." *Id.* But SPBS has failed to show that irreparable injury is likely, much less possible.

- Mobley testified that since being made aware of the Agreement, he has not contacted any SPBS customer or any other potential customer within the geographic scope as outlined in the Agreement.

- Mobley testified repeatedly that he did not take any confidential information or trade secrets in any manner when he left SPBS.

- Daugherty admitted that he has *no evidence* that Mobley took any confidential or trade secret information.

- Daugherty admitted that he has *no evidence* that Mobley or InterMed have been the cause of any loss of contracts or customers.

- Staab testified that InterMed has not asked for, sought, received, or profited off of any so-called confidential information or trade secrets claimed by SPBS. Staab also testified that he is not seeking SPBS's business.

Most importantly, SPBS conveniently glosses over its initial lawsuit filed in Oklahoma state court on May 10, 2018 with much fanfare, resulting in it even obtaining a temporary restraining order (though only on the use of trade of secrets). When the court did not have time on May 17, 2018 for the evidentiary hearing on SPBS's application for temporary injunction, the

court continued the hearing until June 14, 2018 and *allowed the TRO to remain in effect until the evidentiary hearing*. Despite this, SPBS abruptly dismissed the entire lawsuit two business days later; did not refile a lawsuit in this Court until 12 days later;[16] filed the *same, exact* application for preliminary injunction a further four days after; and did not seek a temporary restraining order. And yet, Daugherty's so-called explanation of why SPBS dismissed the Oklahoma lawsuit was because he did not want to wait for the June 14 Oklahoma injunction hearing. If SPBS truly believed there was potential for imminent harm, why did it walk away from the very court it was first granted a temporary injunction hearing?[17]

3. **The Injury to Defendants, if the Injunction is Granted, is Greater than the Potential for Injury to SPBS in the Absence of an Injunction, and the Public Interest Supports Denying the Injunction.**

SPBS has failed to demonstrate any harm is likely. However, as discussed *supra*, the Agreement as written is overly broad, vague, and unreasonably restrictive and would cause undue harm to Mobley's ability to earn a living, which in turn harms InterMed. SPBS's claim that there is no disservice to the public interest because this "is a private dispute" is far afield from the reality of the affect it has on reasonable restraints on employment. As stated, *supra*, the public interest is disserved when an employee is unreasonably restricted in his or her ability to work freely, and, in this case, within his home state. Therefore, preliminary injunction should be denied.

---

[16] SPBS cannot even argue that it needed 12 days to rework their claims, as the Complaint filed in this lawsuit is almost word-for-word identical to the Petition filed in Oklahoma state court.

[17] *See Gonannies, Inc. v. Goupair.Com, Inc.*, 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006) ("Delay in seeking a remedy is an important factor bearing on the need for a preliminary injunction. Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief."); *see also Pruvit Ventures, Inc. v. Forevergreen Int'l LLC*, No. 4:15-CV-571-ALM-CAN, 2015 WL 9876952, at *8 (E.D. Tex. Dec. 23, 2015) ("A nonmoving party may rebut a claim of irreparable harm by demonstrating that the moving party unreasonably delayed seeking a preliminary injunction.").

## IV. CONCLUSION

Defendants request that the Court deny SPBS's Application for Preliminary Injunction and award Defendants any and all other relief to which they are entitled.

        Respectfully submitted,

        THOMPSON, COE, COUSINS & IRONS, L.L.P.

By: */s/ James L. Sowder*
      James Sowder
      State Bar No. 18863900
      Farsheed Fozouni
      State Bar No. 24097705

Plaza of the Americas
700 North Pearl Street, 25th Floor
Dallas, Texas 75201-2832
Telephone:  (214) 871-8200
Facsimile:  (214) 871-8209
Email:  jsowder@thompsoncoe.com
        ffozouni@thompsoncoe.com
**Attorneys for Defendant**
**InterMed Group Services, Inc.**

## CERTIFICATE OF SERVICE

Pursuant to the Federal Rules of Civil Procedure, I hereby certify that a true and correct copy of the foregoing document was electronically filed on August 10, 2018. Notice of this filing will be sent to all counsel of record for all parties by operation of the Court's electronic filing system.

Monte K. Hurst
Elizabeth A. Fitch
Hallett & Perrin, P.C.
1445 Ross Avenue, Suite 2400
Dallas, Texas 75202
(214) 953-0053
(214) 922-4142 [fax]
Monte.Hurst@hallettperrin.com
EFitch@hallettperrin.com

        */s/ James L. Sowder*
        James Sowder