# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| SPBS, INC.,<br><br>v.<br><br>JOHN D. MOBLEY AND INTERMED GROUP SERVICES, INC., | §<br>§<br>§    Civil Action No. 4:18-CV-00391<br>§    Judge Mazzant<br>§<br>§<br>§<br>§ |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is SPBS, Inc.'s ("SPBS") Application for a Preliminary Injunction against Defendants John D. Mobley ("Mobley") and Intermed Group Services, Inc.[1] ("Intermed") (Dkt. #3). After reviewing the relevant pleadings and motion, the Court finds that the motion should be granted.

## BACKGROUND

SPBS provides services for clinical and diagnostic medical equipment management, inspection, maintenance, and repair for "hospitals, surgical centers, clinics, physician offices, manufacturers of healthcare equipment and devices, and other healthcare facilities." (Dkt. #1 at p. 3). SPBS has offices and customers in Texas, Missouri, New Jersey, New Mexico, and Oklahoma.

Mobley joined SPBS in October 2009, as Assistant Sales Director. Thereafter, SPBS promoted Mobley to National Sales and Imaging Director in June 2010 and to Director of National Sales in August 2011. In these roles, Mobley managed sales teams, sales budgets, and "national

---

[1] The Court collectively refers to Mobley and Intermed as the "Defendants."

account relationships." (Dkt. #1). Mobley resigned from SPBS in December 2011, explaining he was joining a company that "in some aspects [competed] with SPBS." (Dkt. #1 at p. 4).

In November 2013, Mobley returned to SPBS as Director of Sales and Marketing in its Dallas office. By signing the offer letter for the position, SPBS claims that Mobley recognized receiving and reading SPBS's Employee Handbook and agreed to comply with, among other things, its Proprietary Information and Invention as well as its Non-Competition Provisions (the "Employment Agreement").

Per the Employment Agreement, SPBS alleges that Mobley agreed not to disclose "Company Information" during or after his employment with the company. SPBS argues that the definition of "Company Information" relevantly includes (1) data compilations, (2) development databases, (3) business plans, (4) pricing strategy and cost data, (5) lists of current and potential customers, (6) strategies, methods, forecasts, and other marketing information and techniques, (7) sales practices, strategies, methods, forecasts, compensation plans, and other sales information, (8) "'know-how' (*i.e.* information about what works well)," and (9) "'negative know-how' (*i.e.* information about what does not work well)." (Dkt. #1 at pp. 4–5). SPBS contends that Mobley further agreed that he would "not directly or indirectly, for [himself] or on behalf of any other person or entity . . . use Company secret information to attempt to call on, solicit or take away any clients or prospects of [SPBS] except on behalf of the Company[]" while employed at SPBS and for one year thereafter pursuant to the Agreement (Dkt. #1 at p. 5).

Mobley worked at SPBS from 2013 to March 2018. During this time, SPBS claims to have given its confidential information and trade secrets to Mobley, such as "customer lists, marketing strategies, training and resources for specific manufacturers' equipment, and information on pricing and equipment lists for customers." (Dkt. #1 at p. 6).

In March 2018, Mobley resigned from SPBS, claiming that he was leaving to work for an oil field services distributor. SPBS, however, contends that Mobley took multiple business trips to cities "where some of SPBS's key clients are located in the days immediately following his departure from SPBS." (Dkt. #1 at p. 8). Thereafter, SPBS claims that one of its clients, with whom Mobley had worked while employed at SPBS, cancelled its contract with SPBS "effective immediately." (Dkt. #1 at p. 9). SPBS allegedly called Mobley to inquire about the canceled contract and Mobley claimed that he was not working for a competitor of SPBS. SPBS then learned that Mobley was working for Intermed—whom SPBS claims is its direct competitor.

On June 1, 2018, SPBS filed suit against Defendants, asserting claims for (1) violation of the Defend Trade Secrets Act ("DTSA") against Defendants; (2) violation of the Texas Uniform Trade Secrets Act ("TUTSA") against Defendants; (3) Computer Fraud and Abuse Act against Mobley; (4) breach of contract against Mobley; (5) breach of fiduciary duty against Mobley; and (6) tortious interference with an existing contract against Intermed (Dkt. #1). On June 4, 2018, SPBS filed its application for a preliminary injunction, asking the Court to enjoin Defendants from using SPBS's trade secrets and Mobley from soliciting SPBS's clients (Dkt. #3). On July 25, 2018, Defendants filed their response (Dkt. #13). On August 1, 2018, SPBS filed its reply (Dkt. #18). On July 27, 2018, and August 3, 2018, the Court held hearings on SPBS's motions for preliminary injunction (Dkt. #16, Dkt. #19). On August 9, 2018, SPBS filed its post-hearing brief in support of its application for preliminary injunction (Dkt. #21). On August 10, 2018, Defendants filed their post-hearing brief in opposition to SPBS's application for preliminary injunction (Dkt. #22). On August 13, 2018, SPBS filed its reply (Dkt. #23.)

## LEGAL STANDARD

A party seeking a preliminary injunction must establish the following elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that plaintiffs will suffer

irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). "A preliminary injunction is an extraordinary remedy and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements." *Id.* Nevertheless, a movant "is not required to prove its case in full at a preliminary injunction hearing." *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1985) (quoting *Univ. of Tex. v. Comenisch*, 451 U.S. 390, 395 (1981)). The decision whether to grant a preliminary injunction lies within the sound discretion of the district court. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).

## ANALYSIS

## I.      Likelihood of Success on the Merits

For the Court to grant a preliminary injunction, SPBS must first demonstrate a substantial likelihood of success on the merits. This requires a movant to present a prima facie case. *Daniels Health Scis., LLC v. Vascular Health Scis.*, 710 F.3d 579, 582 (5th Cir. 2013) (citing *Janvey v. Alguire*, 647 F.3d 585, 595–96 (5th Cir. 2011)). A prima facie case does not mean Plaintiffs must prove they are entitled to summary judgment. *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009).

### A. SPBS Is Likely to Succeed on the Merits for its Trade Secret Misappropriation Claims

SPBS alleges misappropriation of trade secrets against Defendants under DTSA and TUTSA, seeking damages and injunctive relief (Dkt. #1 at pp. 12–13). SPBS argues that Defendants "misappropriated SPBS's trade secrets under the plain meaning of the statutes by taking SPBS's trade secrets, including pricing information, copies of contracts, and customer lists[2]

---

[2]     The Court refers to SPBS's pricing information, copies of contracts, and customer lists as the "Proprietary Information."

(Mobley) and by receiving and using those trade secrets (Intermed)."  (Dkt. #3 at p. 28).

Defendants counter that whether or not SPBS's Proprietary Information qualifies as a trade secret,

Defendants did not misappropriate or use it.

Under DTSA, "[a] claim for misappropriation of trade secrets requires: (1) a trade secret;

(2) misappropriation; and (3) use in interstate commerce. 18 U.S.C. § 1836(b)(1). Texas has

adopted TUTSA, which has similar elements to the federal act. *See* Tex. Civ. Prac. & Rem. Code

Ann. § 134A.002; *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 874 (5th Cir. 2013).  Under

TUTSA, a plaintiff needs to show use without authorization, but not that it was used in interstate

commerce. *Wellogix*, 716 F.3d at 874.

"Under Section 134A.003 [of TUTSA] . . . a party may seek an injunction for actual or

threatened misappropriation of trade secrets." *St. Jude Med. S.C., Inc. v. Janssen-Counotte*, No.

A-14-CA00877-SS, 2015 WL 11438611, at *2 (W.D. Tex. Oct. 30, 2015) (citing Tex. Civ. Prac.

& Rem. Code Ann. § 134A.003).  "'Proof of trade secret misappropriation often depends upon

circumstantial evidence.'"  *GE Betz, Inc. v. Moffitt-Johnston*, 885 F.3d 318, 326 (5th Cir. 2018)

(alteration omitted) (quoting *Sw. Energy Prod. Co. v. Berry-Helfand*, 411 S.W.3d 581, 598

(Tex. App—Tyler) *rev'd on other grounds*, 491 S.W.3d 699 (Tex. 2016)).

### i.      SPBS Adequately Demonstrated that Its Proprietary Information Is a Trade Secret

SPBS argues that the Proprietary Information is a trade secret, affording "independent

economic value from not being general known or available."  (Dkt. #3 at p. 20).  SPBS further

claims that it "competes with other companies such as Intermed in a tight market with a limited

number of customers. . . ."  (Dkt. #3 at p. 20).  SPBS contends that it "gains an advantage in the

market by keeping its data (including prices and customer contacts) secret from its competitors

that are seeking to obtain business from the same customers."  (Dkt. #3 at p. 20).  Defendants

denied that the Proprietary Information is a trade secret.

Under DTSA, a "trade secret" may consist of any formula, pattern, device, or compilation

of information used in one's business, which the owner takes reasonable measures to keep secret,

and which derives economic value from not being generally known by others in competition with

the trade secret holder.  18 U.S.C. § 1839(3).

TUTSA defines a trade secret as

all forms and types of information, including business, scientific, technical, economic, or engineering information, and any formula, design, prototype, pattern, plan, compilation, program device, program, code, device, method, technique, process, procedure, financial data, or list of actual or potential customers or suppliers, whether tangible or intangible and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if:

(A) the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

Tex. Civ. Prac & Rem. Code Ann. § 134A.002(6).  Courts have recognized a compilation of

compensation rates with otherwise publicly available information as a trade secret.  *360 Mortg.*

*Grp., LLC v. Homebridge Fin. Servs., Inc.*, No. A-14-CA-00847-SS, 2016 WL 900577, at *4

(W.D. Tex. Mar. 2, 2016) (explaining if those compensation rates were "obtained by a

competing mortgage bank, [they] could be used to undercut Plaintiff's pricing.").  Most

importantly, even if a compilation of information consists of "readily available" information, "it

may be protected as a trade secret given the difficulty and expense of compiling the information."

*Id.* (citing *Zoecon Indus. v. Am. Stockman Tag Co.*, 713 F.2d 1174, 1179 (5th Cir. 1983)).

Additionally, "readily available information 'will be protected if the competitor obtained it working for the former employer.'" *Id.* (quoting *Alliantgroup, L.P. v. Feingold*, 803 F. Supp. 2d 610, 626 (S.D. Tex. 2011)).

SPBS's Chief Executive Officer ("CEO") Jeff Daugherty ("Daugherty") stated in his affidavit that "SPBS reasonably protects the secrecy of its [P]roprietary [I]nformation, including customer information and their equipment lists, such as [by] utilizing password-protected software and restricted databases." (Dkt. #3, Exhibit 1 at p. 3). As previously discussed, SPBS also makes its employees, including Mobley, sign the Employment Agreement, explicitly prohibiting them from disclosing the Proprietary Information (Dkt. #3, Exhibit 6). Daugherty also asserted that "SPBS's long-term success in the industry is dependent upon SPBS's customer relationships, and goodwill in the industry." (Dkt. #3, Exhibit 1 at p. 3).

With regard to the Proprietary Information's economic value, Daugherty testified that SPBS's underwriting of contracts, type of contracts that the company underwrites with clients, as well as SPBS's pricing, terms, and services are SPBS's trade secrets and confidential information. Daugherty asserted that SPBS specially developed the Proprietary Information. Daugherty contended that if a competitor obtained SPBS's Proprietary Information that competitor could use it to pursue SPBS's business and clients to their advantage and to SPBS's disadvantage. Accordingly, Daugherty testified that Intermed's access to SPBS's Proprietary Information would be disastrous for SPBS and would wreak irreparable harm to SPBS's Employee Stock Ownership Plan ("ESOP"). Daugherty opined that the value of the good-will that SPBS risked losing due to Mobley's alleged misappropriation of its Proprietary Information ranged from $8 to 10 million given the contracts about which Mobley knew.

With regard to maintaining the Proprietary Information's secrecy, Daugherty testified that SPBS has encrypted technology for its Customer Research Management Software ("CRM") to protect its customer lists and customer contact lists. Daugherty averred that industry players submit their pricing by sealed bids, indicating that such information is indeed confidential and proprietary. Daugherty offered this testimony to refute Mobley's claim that users and purchasing agents openly discuss pricing arrangements. Daugherty declared that pricing, contracts, customer lists, and client contacts were not public information based on his fourteen years of industry experience. Daugherty explained that Mobley was a high-level employee with access to all of its Proprietary Information.

With regard to the Proprietary Information's economic value, Mobley admitted that this type of information was extremely important for negotiating client contracts to SPBS and to Intermed. Mobley explained that if he were to disclose SPBS's confidential information to a competitor during a negotiation, he could lose the sale. While on the stand, Mobley recognized an affidavit, which he submitted for an earlier SPBS trade secret lawsuit, explaining that SPBS spends time, labor, and resources to compile and maintain confidential information about its clients, including contracts, equipment lists, equipment maintenance schedules, work orders, marketing strategies, and pricing information. Mobley then dismissed the affidavit, claiming that all of the Proprietary Information is in the market and that he only said otherwise because that was SPBS's opinion. Mobley said that he did not believe that the Proprietary Information was a trade secret.

Intermed's CEO Rick Staab ("Staab") denied that Intermed would ever use SPBS's Proprietary Information, particularly its pricing, because there is no secret sauce in SPBS's and Intermed's industry but years of experience that determines pricing. Staab later denied that Intermed drew any competitive advantage from its own version of the Proprietary Information.

With regard to the Proprietary Information's secrecy, Mobley claimed that one type of Proprietary Information, customer buying history, was available to the general public then said that the sole way for a layperson to get such data was to ask for it from the hospital employees who manage bill payments. Mobley said the only way for the average person to get Intermed's numbers, i.e. the buying history or pricing history of Intermed's top ten clients, was to know and ask one of Intermed's employees. Mobley admitted that Intermed looked upon such data as confidential information. Mobley next confessed that marketing strategies were confidential information. Mobley conceded that SPBS's pricing, buying history of clients and marketing strategies were not available to the general public. Finally, Mobley testified that the non-disclosure agreement and password protection intended to protect SPBS's confidential information.

Staab wholly denied that anything in Intermed's and SPBS's business was a secret, let alone a trade secret, including customer lists, customer preferences, buying history, and marketing strategies. Staab claimed that Intermed's pricing strategies are not a trade secret and said that people only needed to ask him for his pricing strategies. Staab then admitted that Intermed kept its inventory, financials, emails, intranet, containing its pricing strategies, employee portal, and other information under password protection. Staab said that Intermed had all of its employees sign a non-disclosure and a non-compete agreement to stop them from taking Intermed's information and using it for their benefit. Staab claimed that Intermed deployed the non-disclosure and non-competition agreements as a deterrent to employees from committing immoral deeds but was not sure these agreements could correct such problems. Staab explained that the agreements were aimed to prevent lying, cheating, or stealing but that he had no specific objective in having Intermed's employees sign them.

Throughout two days of preliminary injunction hearings, Mobley and Staab admitted facts that were harmful to their case and then denied the legal consequences of those facts without rational explanation. How, for example, can Staab and Mobley admit that SPBS and Intermed take several measures to protect their proprietary information and then claim that it is not valuable? How can Staab and Mobley recognize that SPBS and Intermed take several measures to keep their proprietary information secret and then claim that it is publicly available? How can Staab say that years of experience dictate Intermed's pricing strategy and then claim that there are no trade secrets in the industry?

Indeed, Staab's claim that there is no secret sauce in the industry but years of experience contradicts itself. The term "secret sauce" in the business context means a competitive advantage, arising from years of experience, proprietary insights, research and development, etc. *See* Andrew A. Schwartz, *The Corporate Preference for Trade Secrets*, 74 Ohio ST. L.J. 623, 651 n.181 (2013) (quoting *Europeans Open Probe of Google*, S.F. Chron., Dec. 1, 2010, at A1) (referring to "the secret sauce' of [Google's] search algorithm")). In other words, "secret sauce" refers to a trade secret. Next, by claiming that companies develop pricing strategies through years of experience, Staab admitted that SPBS's and Intermed's pricing strategies are trade secrets.

Even without the evidence that SPBS offered to the Court to support its claim that the Proprietary Information is a trade secret, the Court finds Defendants' testimony inconsistent, irrational, and incredible. Accordingly, SPBS demonstrated that it derives economic value from the Proprietary Information, the Proprietary Information is not readily ascertainable, and it takes reasonable measures to keep the Proprietary Information secret. Thus, the Court concludes that SPBS has sufficiently shown that the Proprietary Information qualifies as a trade secret for purposes of this preliminary injunction analysis.

### ii. SPBS Made a Prima Facie Case that Defendants Acquired Its Trade Secret by Improper Means

SPBS argues that Mobley misappropriated its trade secrets by taking its Proprietary Information to Intermed. Defendants counter that SPBS offered no evidence that they took or used SPBS's Proprietary Information.

Under DTSA, "misappropriation" is satisfied if disclosure of the trade secret is made, without consent, by a person who acquired the knowledge under circumstances giving rise to a duty to maintain its secrecy. 18 U.S.C. § 1839(5). "Improper means" includes breach of a duty to maintain secrecy, but does not include reverse engineering or independent derivation. 18 U.S.C. § 1839(6).

TUTSA partly defines "misappropriation" as

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret of another without express or implied consent by a person who:

(i)     used improper means to acquire knowledge of the trade secret;

(ii)    at the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:

(a) derived from or through a person who used improper means to acquire the trade secret;

(b) acquired under circumstances giving rise to a duty to maintain the secrecy of or limit the use of the trade secret; or

(c) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of or limit the use of the trade secret. . . .

Tex. Civ. Prac & Rem. Code Ann. § 134A.002(3)(A)(B). "'Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, to limit

use, or to prohibit discovery of a trade secret, or espionage through electronic or other means."

Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(2) (emphasis added).

SPBS presented a wealth of circumstantial evidence that strongly indicates Defendants acquired its trade secret by improper means. Via affidavit, Daugherty declared that Mobley deleted many of his e-mails messages and e-folders before leaving SPBS and the company's information technology personnel believed that they were permanently deleted (Dkt. #3, Exhibit 1 at p. 5). In the hearing, Daugherty testified that Mobley claimed he was leaving SPBS because he was tired of sales and wanted to take a sabbatical and join his brother's start-up distribution company in Oklahoma City. Daugherty elaborated that Mobley assured him that his brother's company was an oil field services distribution company and did not compete with SPBS. Mobley explained that he lied about his next employer because he was scared of Daugherty and uncomfortable around him. Mobley, however, gave no evidence to found his fears that Daugherty might threaten him with physical harm if he went to a competitor. Mobley claimed not to know that he had signed a non-competition agreement and also denied that Intermed is a direct competitor of SPBS. Mobley admitted sending emails to his personal email address but dismissed it as personal information. Mobley also said that he threw away a thumb drive with a back-up of his SPBS computer but explained it was only a thumb drive and he had many of them. Mobley admitted not asking anyone at SPBS whether he should have returned the thumb drive to SPBS. When asked whether that thumb drive might reveal the files that Daugherty claimed Mobley deleted from his SPBS computer, Mobley disagreed since the thumb drive was old.

As mentioned, the Court harbors serious doubts as to Mobley's and Staab's credibility. Meanwhile, SPBS offered a plausible sequence of events for trade secret misappropriation—(1) an employee claims to be leaving a company for another company in an entirely different industry,

(2) the employee deletes his company email or other databases, containing his communications, and (3) the employee joins a competitor of his former company. As previously discussed, SPBS alleged that Mobley immediately pursued SPBS's clients upon joining Intermed whom he would not have known but for his employment with SPBS. Based on the evidence presented, the Court recognizes that Mobley had access to SPBS's Proprietary Information and likely took the Proprietary Information to Intermed.

Accordingly, SPBS adequately demonstrated that Mobley acquired its trade secret by improper means and Intermed acquired SPBS's trade secret when it knew or had reason to have known that it was acquired by improper means or used[3] SPBS's trade secret after it was "derived from or through a person who used improper means to acquire the trade secret." *See* Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(3). Thus, the Court finds that SPBS made a prima facie case that Defendants obtained its trade secrets by improper means for purposes of this preliminary injunction analysis.

### iii.    SPBS Made a Prima Facie Case that Defendants Used Its Trade Secret

"As a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use.'" *GE Betz*, 885 F.3d at 326 (quoting *Wellogix, Inc.*, 716 F.3d at 877). "Use" can be found where the exploitation includes "relying on the trade secret to assist or accelerate research or development." *GlobeRanger Corp. v. Software AG United States of Am., Inc.*, 836 F.3d 477, 498 (5th Cir. 2016) (citing *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 721–22 (Tex. 2016)) (holding that Texas follows "traditional trade secret law"). "[P]roof of the defendant's knowledge of the trade secret together

---

[3] The Court discusses Intermed's use of the Proprietary Information in the following section. *Infra* at 13–16 "SPBS Made a Prima Facie Case that Defendants Used Its Trade Secret."

with substantial similarities between the parties' products or processes may justify an inference of use by the defendant." *Spear Mktg., Inc. v. BancorpSouth Bank*, 791 F.3d 586, 601 (5th Cir. 2015).

SPBS presented ample circumstantial evidence to indicate Defendants used its Proprietary Information in a manner likely to injure SPBS and enrich Defendants. In his affidavit, Daugherty declared that after leaving SPBS, "Mobley visited Conroe, just north of Houston where many of SPBS's important clients are located, such as Kindred Hospital." (Dkt. #3, Exhibit 1 at p. 4). Daugherty averred that Mobley visited the "Houston area again from April 9, 2018 through April 12, 2018." (Dkt. #3, Exhibit 1 at p. 4). Daugherty added that after the trip to Houston, Mobley contacted Kindred Hospital's representative whom he only knew from working at SPBS (Dkt. #3, Exhibit 1 at p. 4). Daugherty contended that Mobley told Kindred Hospital's representative that he had left SPBS and then sought Kindred Hospital's business. Daugherty also asserted that Mobley tried to access his SPBS e-mail account, but the company denied him. Daugherty also claimed that shortly after Mobley left SPBS, the company's client New York Presbyterian Methodist Hospital ("New York Presbyterian")—an account on which Mobley had worked while employed with SPBS—canceled its contract with SPBS, effective immediately. Daugherty declared that just one day before, New York Presbyterian and SPBS were working to expand their service contract. (Dkt. #3, Exhibit 1 at p. 5).

In the hearing, Daugherty testified that Mobley did not bring many customers, if any, from his previous employment to SPBS and most of the customers he knew in the industry were SPBS's customers. Daugherty claimed that Mobley had been using service, billing, and underwriting information, involving SPBS's top ten to fifteen clients, since leaving the company.

Mobley denied pursuing SPBS's business or taking business from SPBS when he left for Intermed. Mobley testified that he called on Park Place Surgical Hospital ("Park Place") in

Lafayette, Louisiana, after leaving SPBS. Mobley admitted that he and another SPBS employee, Heather Columbo, had pursued business with Park Place when Mobley worked at SPBS. Mobley also explained that no one was at Park Place to whom he could pitch Intermed's services when he visited after leaving SPBS.

Mobley then admitted that he had lunch with First Choice ER—SPBS's current customer—to pitch Intermed's imaging services to it shortly after leaving SPBS. Mobley conceded that he only knew about First Choice ER by working at SPBS. Mobley explained that he did not consider this to be competing with SPBS because SPBS did not offer imaging services.

Mobley denied trying to access SPBS's computers. Mobley generally denied soliciting business within 250 miles of Lubbock, Houston, Arlington, Oklahoma City, San Angelo, or Waco.

Again, Mobley admitted facts that were harmful to his case only to draw inexplicable conclusions to serve his interests. Even if the Court accepts Mobley's claim that no one was at Park Place when he visited to pitch Intermed's services after leaving SPBS, Mobley still admitted going to pitch Intermed's services to Park Place after leaving SPBS. If Mobley could not even admit that he tried to pitch Intermed's services to Park Place, why should the Court believe his blanket denial of soliciting business within 250 miles of Lubbock, Houston, Arlington, Oklahoma City, San Angelo, and Waco? After all, Mobley visited some of those locations immediately after leaving SPBS. As previously noted, the persistent inconsistency and, indeed, irrationality of Mobley's testimony made it unbelievable. Accordingly, the Court assigned it little, if any, weight in its preliminary injunction analysis.

All of this evidence strongly indicates that Mobley and, indeed, Intermed as his employer used the Proprietary Information to their benefit and to SPBS's detriment. In its briefing and in the preliminary injunction hearing, SPBS clearly and comprehensively connected the dots between

this circumstantial evidence and its claims for misappropriation of Trade Secrets. Thus, the Court finds that SPBS presented a prima facie case for misappropriation of trade secrets under DTSA[4] and TUTSA and is likely to succeed on the merits of its misappropriation of trade secrets claims for the sake of this preliminary injunction analysis.

### iv. SPBS Made a Prima Facie Case for Injunctive Relief due to Threatened Misappropriation Under TUTSA

"[T]o establish threatened disclosure, the law requires [Plaintiff] to show disclosure of specific trade secrets would benefit [an employee's new employer]." *St. Jude Medical*, 2015 WL 11438611, at *3 (citing *Conley v. DSC Commc'ns Corp.*, No. 05-98-01051-CV, 1999 WL 89955, at *3 (Tex. App.—Dallas Feb. 24,1999, no pet.)) (applying the trade secret disclosure test from *Conley*). This arises from the fact that

> [c]ertain duties, *apart from any written contract*, arise upon the formation of an employment relationship. One of those duties forbids an employee from using confidential or proprietary information acquired during the relationship in a manner adverse to the employer. This obligation survives termination of employment. Although this duty does not bar use of general knowledge, skill, and experience, it prevents the former employee's use of confidential information or trade secrets acquired during the course of employment.

*Conley*, 1999 WL 89955, at *3 (citations omitted) (emphasis added). Courts recognize "that enjoining an employee from using an employer's confidential information is appropriate when it is *probable* that the former employee will use the confidential information for his benefit (or his new employer's benefit) or to the detriment of his former employer." *Id.* at *4 (citation omitted). When assessing a trade secret's potential benefit to a new employer and its detriment to an old employer, courts consider the similarities of the market in which the two employers operate.

---

[4] As noted, DTSA differs from TUTSA by requiring use in interstate commerce. SPBS alleges that Mobley took Proprietary Information from one of its Texas offices and used it to solicit clients in other states such as Louisiana. Thus, the facts demonstrate that Mobley used the Proprietary Information in interstate commerce for purposes of this preliminary injunction analysis.

*St. Jude Med.*, 2015 WL 11438611, at *3 (explaining that the plaintiff could not show threatened disclosure because "the marketing strategies in Europe and the United States [where the current and former employers do business] are 'extremely different.'").

In the hearing, Daugherty testified that SPBS and Intermed competed for a contract with a hospital in Amarillo, Texas, and Intermed prevailed. Daugherty claimed that both SPBS and Intermed bid on the contract according to what that Hospital said to SPBS. Accordingly, Daugherty claimed that Intermed was SPBS's competitor. Mobley denied that Intermed competed with SPBS and claimed that SPBS was unable to compete for the contract with the hospital in Amarillo, Texas, because it lacked adequate personnel. In his testimony Mobley acknowledged that SPBS and Intermed provided medical equipment service and sales but claimed that SPBS did not provide imaging services. Mobley then admitted to pitching imaging services twenty times in his second five-year stint at SPBS and that SPBS won some of the contracts that he pitched. Mobley elaborated that SPBS outsourced those services and, for this reason, he believed that SPBS did not sell imaging services. Mobley also admitted that Intermed managed imaging equipment but denied that the two companies were competitors. Mobley apparently explained this conclusion by claiming that SPBS and Intermed never bid for the exact same services.

Mobley later claimed that SPBS offered imaging services when he worked there but stopped when he departed. Mobley testified that Brandon Salone, SPBS's Austin Branch Manager said SPBS was unable to offer imaging services only to admit that SPBS could in fact compete for imaging services using independent contractors. Mobley conceded knowing that SPBS employed an imaging technician—Mike Sermons—and then recalled two independent contractors whom SPBS retained as imaging technicians during Mobley's second stint at SPBS. Finally, Mobley acknowledged providing imaging services while at SPBS through independent contractors.

Mobley admitted that he was the face of SPBS for its top ten to fifteen customers with regard to sales. Mobley confessed knowing that First Choice ER, whom he visited in April 2018 on Intermed's behalf, was a customer of SPBS. Mobley conceded that he only had a relationship with First Choice ER by working at SPBS and that he had actively negotiated a contract between SPBS and First Choice ER. Mobley admitted that SPBS inspects and maintains First Choice ER's X-Ray Equipment and agreed that X-Ray Equipment was imaging.

When SPBS presented a list of several hundred C-Arms—a form of imaging equipment that SPBS services—Mobley also acknowledged that they were imaging devices. Mobley defined "service" as having a technician who was specifically trained for the relevant equipment's make, model, and modality. After offering his own definition for "service," Mobley had trouble understanding what the term "service" meant and claimed not to know whether SPBS serviced C-Arms. Mobley later admitted that if SPBS were only offering inventorying services to C-Arms, then SPBS would still be offering a service and Intermed competed in this area. Still, Mobley claimed that SPBS and Intermed did not compete for this business as they never directly competed. Mobley then denied that SPBS and Intermed competed in the realm of imaging services except for inventorying and possibly electrical safety. Mobley then admitted that SPBS and Intermed both offered medical equipment inspection and "biomed" services.

Staab denied that SPBS and Intermed were competitors but conceded that they shared a national customer. Staab proclaimed that Intermed would welcome any business, including SPBS's business with that shared client. Staab also said he would take business in any place with First Choice ER—a company with whom SPBS also seeks to do business—but insisted that Intermed and SPBS were not competing for that business. Staab also admitted that a company called JLL manages Kindred Hospitals and that JLL asked Intermed to submit a bid for services

for Kindred Hospitals. Staab said that SPBS does some work for JLL, concerning Kindred Hospitals, but denied that Intermed was competing for any of SPBS's service with Kindred Hospitals because JLL told Intermed that SPBS did not offer imaging services. Staab denied competing with SPBS for Kindred Hospitals' business because Intermed did not pursue Kindred Hospital's business in a specific state or at the expense of any other company.

Staab explained that Intermed had no complete competitors but "coopetition"—part competitor, part cooperative partner, part customer—encompassing hundreds of companies throughout the nation. Accordingly, despite twenty-eight years as Intermed's CEO, Staab first could not name a single direct competitor of Intermed. Only after extensive questioning was Staab able to name a single competitor of Intermed. Finally, Staab explained that he hired Mobley in late March but promoted him a few weeks before the preliminary injunction hearing over two other employees in part because Mobley demonstrated a superior capacity to comprehend Intermed's processes.

The Defendants did not persuade the Court that Intermed and SPBS do not compete for two reasons. First, Mobley's and Staab's testimony was not credible. Both witnesses repeatedly recognized facts that strongly suggested SPBS and Intermed were competitors only to deny that they could be competitors for either irrational or entirely subjective reasons. Mobley and Staab repeatedly claimed that SPBS and Intermed could not be competitors because they could not recall ever competing with SPBS, that they did not intend to compete with SPBS, or that Intermed did not directly compete with any other company. For this reason, they refused to accept that two companies that appear to provide similar, if not identical, services in many of the same geographic areas competed with one another. The fact that Staab initially could not name a single company that competed with Intermed and eventually could only name one despite serving as Intermed's

19

CEO for twenty-eight years all but subverted his credibility as a witness. After all, Daugherty explained that the two companies operated in a lucrative market. Thus, there is no reason to believe that only one company would or could occupy it.

Staab's concept of "coopetition" was amusing at best and deceitful at worst. This puzzling portmanteau sums up the doublespeak that defined Mobley's and Staab's testimony—both witnesses admitted facts that clearly supported one conclusion only to argue the opposite conclusion with little basis in fact or reason. Two parties cannot cooperate and compete at the same time much like one cannot lie and tell the truth at the same time.

The second reason that Defendants failed to convince the Court that SPBS and Intermed are not competitors is that the facts strongly suggest that they are competitors. Two days of hearings show that the companies provide similar, if not identical, services to similar, if not identical, customers. Defendants offered no compelling evidence to show otherwise and, instead, confirmed this conclusion through their own testimony.

SPBS's Proprietary Information would certainly benefit Intermed and would certainly harm SPBS. Mobley's disclosure of the Proprietary Information to Intermed is probable as doing so would benefit Intermed and harm SPBS. In turn, SPBS has made a prima facie case for injunctive relief for threatened misappropriation of its trade secrets under TUTSA. *St. Jude Med.*, 2015 WL 114338611, at *3.

## B. SPBS Is Likely to Succeed on the Merits for its Breach of Contract Claim Against Mobley

SPBS argues that Mobley violated the Employment Agreement's non-disclosure, non-competition, and non-solicitation covenants. SPBS claims that the Employment Agreement's non-competition provision is enforceable under Section 15.50 of the Texas Business and Commerce Code. Mobley counters that the Employment Agreement's Governing Law Provision

is invalid since Oklahoma law should apply, and the non-competition provision is unenforceable under Oklahoma law. Finally, Mobley contends that if the Employment Agreement is in fact enforceable under Texas law, he never breached its "vague, ambiguous, and unduly broad" terms (Dkt. #13 at p. 16). The Court will address each argument in turn.

"'Where federal question jurisdiction is invoked[5], as here, federal courts generally apply federal common law principles to resolve choice of law disputes.'" *Yesh v. Lakewood Church*, 2012 WL 5244187 at *3 (quoting *Nat'l Fair Housing Alliance, Inc. v. Prudential Ins. Co. of Am.,* 208 F.Supp.2d 46, 62 (D.D.C. 2002) (alteration omitted). "'Federal common law follows the approach of the Restatement (Second) of Conflicts of Laws.'" *Id.* (quoting *Nat'l Fair Housing Alliance*, *Inc.*, 208 F.Supp.2d at 46).

> According to the Restatement (Second) of Conflicts of Laws, "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue."

*Yesh*, 2012 WL 5244187 at *3 (quoting Restatement (Second) of Conflict of Laws § 187(1)).

The Employment Agreement stipulates that it "will be governed by the laws of the State of Texas, without regard to conflicts of law principles." (Dkt. #3, Exhibit 6 at p. 5). To render a choice-of-law provision unenforceable, a party must satisfy Section 187(2) of the Restatement (Second) of Conflict of Laws, explaining that:

> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>
> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

---

[5] Even though SPBS's breach of contract claim against Mobley is a state law claim, the Court has federal question jurisdiction based on SPBS's DTSA claim.

> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188 [of Restatement (Second) of Conflict of Laws], would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Cardoni v. Prosperity Bank*, 805 F.3d 573, 581 (5th Cir. 2015) (quoting Restatement (Second) of Conflict of Laws § 187)[6].  Subsection 187(2)(a) does not avail Mobley.  After all, SPBS and Mobley had a reasonable basis for contracting that Texas law would govern because SPBS's principal place of business is in Texas.  *See id.* (citing *Exxon Mobil Corp. v. Drennen*, 452 S.W.3d 319, 325 (Tex. 2014)).  The parties' dispute, however, centers on Subsection 187(2)(b).  Even when there is a reasonable basis for selecting a state's law to govern a contract, the parties' choice does not control if another state:

> (1) has a more significant relationship with the parties and the transaction at issue than the chosen state does under Restatement § 188; (2) has a materially greater interest than the chosen state does in the enforceability of a given provision; and (3) has a fundamental policy that would be contravened by the application of the chosen state's law.

*Cardoni*, 805 F.3d at 581 (citing *Drennen*, 452 S.W.3d at 325–27).  The Fifth Circuit first evaluates which state has the "more significant relationship" by examining several contacts under "basic choice-of-law principles enumerated in Section 6 of the Restatement."  *Id.* at 582 (citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 678 (Tex. 1990).  After all, if a state's law other than that of the state designated by the choice-of-law provision "would not apply even under an ordinary conflicts analysis without a choice-of-law provision in the mix, then there is no reason to consider whether public policy trumps the parties' agreement."  *Cardoni*, 805 F.3d at 582.  The relevant contacts consist of:

> (a) the place of contracting,
> (b) the place of negotiation of the contract,

---

[6] Even though in *Cardoni* the court was sitting in diversity and applied state choice of law provisions, Restatement (Second) of Conflicts of Laws is also used in federal choice of law principles. *Yesh*, 2012 WL 5244187 at *3.

(c) the place of performance,
(d) the location of the subject matter of the contract, and
(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

*Id.* (citing Restatement § 188(2)). *Cardoni* recognized the place where the employee performed the work as the "most significant" factor in the "most significant relationship" analysis. *Id.* at 582–83.

Given these factors, Texas has the most significant relationship to the parties and the transactions giving rise to this proceeding. Mobley was hired to SPBS's Dallas Office. Though Mobley maintained his residence in Oklahoma, the briefings and hearings show that he actually performed his work by spending time on the road pitching SPBS's services to customers and most of SPBS's customers were in Texas. This makes sense since Mobley was, after all, SPBS's Director of Sales responsible for "driving overall new business development growth in existing as well as new markets." (Dkt. #3, Exhibit 5 at p. 2). Thus, Mobley improperly relies on *Cardoni*, as its facts are inapposite to those here. *See* 805 F.3d at 583 (finding that Oklahoma, rather than Texas, had a greater interest in a case involving the enforceability of a non-competition agreement primarily because the employees "performed all of their work" for the first employer and "most of their work" for the second employer in Oklahoma). SPBS has many clients in Texas whom it suspects and, indeed, alleges Mobley pursued after leaving SPBS in violation of his non-competition provision. With regard to the first two factors, neither party persuaded the Court of whether the Employment Agreement was completely executed or negotiated in Texas or Oklahoma in their briefing or in the hearing. With regard to the third factor, the subject matter of Mobley's Employment Agreement appears to be largely in Texas where the bulk of SPBS's customers were based. With regard to the fourth factor, SPBS is a Texas corporation with its principal place of business in Flowed Mound, Texas, Mobley resides in Oklahoma, and a great

deal of SPSB's business occurs in Texas (Dkt. #1 at p. 2). Thus, two of the four remaining factors favor Texas in the "most significant relationship" analysis. *See* 805 F.3d at 582. Again, the most significant factor—the place of performance—favors Texas as having the more significant relationship to the contract. Since Mobley cannot clear this first of three hurdles to rendering the governing law provision unenforceable, the Court will apply Texas law. *Cardoni*, 805 F.3d at 581 ("To render a choice-of-law provision unenforceable, a party must satisfy the standards in Section 187(2) of the Restatement (Second) of Conflict of Laws. . . .")

Covenants not to compete are generally disfavored by Texas courts. *Marsh U.S., Inc. v. Cook*, 354 S.W.3d 764, 768 (Tex. 2011). However, the Supreme Court of Texas noted that the Texas Legislature enacted the Covenants Not to Compete Act to restore the well-established rule in Texas that non-competition clauses "pertaining to employment were not normally considered to be contrary to public policy." *Marsh*, 354 S.W.3d at 733 (alteration omitted). To be enforceable under Texas law, a covenant not to compete must be: (1) ancillary to or part of an otherwise enforceable agreement; (2) contain reasonable limitations as to time, geographical area, and scope of activity to be restrained; and (3) not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee. Tex. Bus. & Comm. Code Ann. § 15.50(a). Whether a noncompete is a reasonable restraint of trade is a question of law for the court. *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 388 (Tex. 1991); *Martin v. Credit Protection Ass'n*, 793 S.W.2d 667, 668–69 (Tex. 1990). Restraints are unreasonable if they are broader than necessary to protect the legitimate interests of the employer. *DeSantis*, 793 S.W.2d at 681–82; *Henshaw v. Kroenecke,* 656 S.W.2d 416, 418 (Tex. 1983). By determining that the Employment Agreement's governing law provision is valid, the Court addressed Mobley's only

apparent and comprehensive argument concerning the Employment Agreement's enforceability, i.e. the first element[7].  Thus, the Court will analyze the latter two elements.

 "The courts of this state have upheld restrictions ranging from two to five years as reasonable."  *Prop. Tax Assocs., Inc. v. Staffeldt*, 800 S.W.2d 349, 350–51 (Tex. App.—El Paso 1990), writ denied (June 5, 1991) (collecting cases).  "Generally, a reasonable area for purposes of a covenant not to compete is considered to be the territory in which the employee worked while in the employment of his employer."  *Curtis v. Ziff Energy Grp., Ltd.*, 12 S.W.3d 114, 119 (Tex. App.—Houston [14th Dist.] 2000), rehearing overruled (Feb. 3, 2000) (emphasis added) (finding that based on the employee's "job description and responsibilities, it was reasonable to restrict [him] from working in other oil and gas consulting firms *in North America* for a six month period, and it did not impose an unnecessary restraint.").

The Employment Agreement's non-competition provision forbids Mobley from "soliciting business or sales from, or attempting to convert to other sellers or providers of the same or similar products or services as provided by [SPBS]; any customer, client or account of [SPBS] with which [Mobley] has had any contact during the term of employment."  (Dkt. #3, Exhibit 6 at p. 4).  The non-compete clause explains that a former employee shall not compete with SPBS for a "period of twelve (12) months after Employee ceases to be employed by [SPBS], . . . within a 250 mile radius of Lubbock, Texas and/or San Angelo, Texas and or Arlington, Texas and/or Waco, Texas and/or Houston, Texas, and/or Dallas, Texas, and/or Albuquerque, New Mexico, and/or Oklahoma City, Oklahoma. . . ."  (Dkt. #3, Exhibit 6 at p. 3).

The scope of the non-competition provision is reasonable.  SPBS had a protectable economic interest in preventing competition for a reasonable amount of time in the cities where its

---

[7] Mobley also contended that the Employment Agreement's non-competition provision was unduly broad but the provision's language, as analyzed in the following paragraphs, proves otherwise.

offices and customers are located. SPBS had an interest in protecting this business as well as the $8–10 million of goodwill that Mobley's knowledge of its Proprietary Information could allegedly impact. *Supra* at 7. To protect this, SPBS could reasonably limit Mobley from competing with it for a reasonable period. Since Mobley was responsible for "driving overall new business development growth in existing as well as new markets," the non-competition provision's geographic restraints are also reasonable (Dkt. #3, Exhibit 5 at p. 2). Thus, the Employment Agreement's non-competition provision places reasonable limits on time, geographic, and scope of activity to be restrained.

Under Texas law, "[t]he elements of a breach of contract claim are: (1) the existence of a valid contract between plaintiff and defendant; (2) the plaintiff's performance or tender of performance; (3) the defendant's breach of the contract; and (4) the plaintiff's damage as a result of the breach." *In re Staley,* 320 S.W.3d 490, 499 (Tex. App.—Dallas 2010, no pet.). Mobley signed the Employment Agreement, containing the non-competition provision, that specifically prohibited him from, among other things, pursuing SPBS's customers with whom he had contact while working at SPBS or engaging in business that competes with SPBS in certain areas for a certain period of time (Dkt. #3, Exhibit 6 at pp. 3–4). As amply discussed, Mobley became involved directly in a competing business and pursued SPBS's customers with whom he had contact while working at SPBS within the prohibited geographic areas before the non-competition provision expired. *Supra* at 13–21. Therefore, SPBS made a prima facie case that Mobley breached the Employment Agreement's non-competition provision for purposes of this preliminary injunction analysis.

Since SPBS demonstrated a likelihood of success on the merits with regard to its DTSA and TUTSA claims against Mobley and Intermed, as well as its breach of contract claim against

Mobley, the Court will consider whether it has satisfied the remaining elements for achieving a preliminary injunction.

## II.     Likelihood of Irreparable Harm

SPBS must demonstrate they it is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). "[H]arm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey*, 647 F.3d at 600. An injunction is appropriate only if the anticipated injury is imminent and not speculative. *Winter*, 555 U.S. at 22. SPBS faces irreparable harm by Defendants' misappropriation of trade secrets because Defendants can benefit from SPBS's trade secrets without first investing the time, expense, and labor necessary to research and compile the Proprietary Information. *See Halliburton Energy Servs., Inc. v. Axis Techs., LLC*, 444 S.W.3d 251, 260 (Tex. App.—Dallas Aug. 21, 2014, no pet.) (citing *K&G Oil Tool & Serv. Co. v. G&G Fishing Tool Serv.*, 158 Tex. 584, 314 S.W.2d 782 (1958)). Defendants' possession of the Proprietary Information allows them to enhance Intermed's own proprietary information through SPBS's labor. This cannot be undone by money alone. Any calculation of monetary damages would fail to fully appreciate the harm done by Defendants' developing a more robust store of proprietary information by skipping the necessary research and development undertaken by every other competitor. *Halliburton*, 444 S.W.3d at 260.

## III.     Balance of Hardships

When deciding whether to grant a preliminary injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citation omitted). Courts consider several factors in balancing the equities. Notably, courts consider the threat of disclosure of the trade secrets by defendants, *Cisco Sys., Inc. v. Huwaei Techs.*, 266 F. Supp. 2d 551, 555–58

(E.D. Tex. 2003), whether the injunction will effectively destroy a party's business, *Anadarko Petroleum Corp. v. Davis*, No. H-06-2849, 2006 WL 3837518, at *24 (S.D. Tex. Dec. 28, 2006), and whether denial will cause a loss of current market share or simply reduce prospects for expansion, *Flywheel Fitness, LLC v. Flywheel Sports, Inc.*, No. 4:13-CV-48, 2013 WL 12138593, at *4 (E.D. Tex. 2013).

Here, the equities favor a preliminary injunction as requested by SPBS in its application for a preliminary injunction (Dkt. #3 at p. 27). As previously discussed, the Court finds that disclosure of SPBS's Proprietary Information by Mobley to Intermed—SPBS's competitor—is probable. Intermed has pre-existing clients, so a preliminary injunction will not destroy Intermed. For the same reasons, enjoining Defendants as SPBS requests may reduce Intermed's prospects for expansion but will not cost it any market share. Thus, the equities favor granting a preliminary injunction.

## IV. The Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger*, 465 U.S. at 312). This factor overlaps substantially with the balance-of-hardships requirement. *Id.* "The purpose of an injunction is to remove the advantage created by the misappropriation." *Halliburton*, 444 S.W.3d at 257 (citing *Bryan v. Kershaw*, 366 F.2d 497, 502 (5th Cir. 1966)). Indeed, "the undoubted tendency of the law has been to recognize and enforce higher standards of commercial morality in the business world." *Id.* (quoting *Hyde Corp. v. Huffines*, 158 Tex. 566, 581–82, 314 S.W.2d 763, 773 (1958)). Here, a preliminary injunction serves the public interest by depriving Defendants of the benefit of the allegedly misappropriated trade secrets and, in so doing, enforces better business ethics by

depriving the alleged wrongdoers of the benefit of their wrongdoing. Thus, the Court finds that a preliminary injunction will only serve the public interest.

## CONCLUSION

It is therefore **ORDERED** that Plaintiff's Application for Preliminary Injunction (Dkt. #3) is hereby **GRANTED**.

It is further **ORDERED** that Defendants John D. Mobley and Intermed Group Services, Inc., their officers, agents, servants, consultants, contractors, employees, attorneys, and any person or entity in concert or participation with them, are hereby **ENJOINED** from:

(1) disclosing any customer of SPBS or member of SPBS's network of clients, SPBS's pricing strategies and cost data, marketing information and techniques, sales information, suppliers, vendors, contractors, the preferences or individual contacts of any SPBS customer, or SPBS's efforts to market to those customers;

(2) divulging, disclosing, or communicating in any manner any confidential or proprietary information or trade secrets that is the sole property of SPBS to any third party without the prior written consent of SPBS;

(3) using in any manner any confidential or proprietary information or trade secret that is the sole property of SPBS;

(Dkt. #3 at p. 27). It is further **ORDERED** that Defendant John D. Mobley, his officers, agents, servants, consultants, contractors, employees, attorneys, and any person or entity in concert or participation with him, is hereby **ENJOINED** from:

(1) soliciting, working for, consulting with or providing any services, either directly or indirectly, to any of SPBS's customers who were customers at the time that Mobley was employed with SPBS; and

(2) competing with SPBS, either directly or indirectly, individually or through employment by, participation in or consultation for any other business or venture that is the same as, similar to, or competitive with SPBS within a 250-mile radius of Oklahoma City, Oklahoma; Lubbock, Texas; San Angelo, Texas; Arlington, Texas; Waco, Texas; Houston, Texas; Dallas, Texas; and Albuquerque, New Mexico.

(Dkt. #3 at p. 27).  It is further **ORDERED** that this Preliminary Injunction shall not be effective unless and until SPBS, Inc. files an appropriate bond or cash deposit in lieu thereof in the amount of $1,500.

      **SIGNED this 31st day of August, 2018.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE